RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEVIN FORDHAM (24-2033); MARTIN MURFF (24-2041); EDDIE REID (24-2046),

*Defendants-Appellants*.

Nos. 24-2033/2041/2046

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cr-20354—Jonathan J.C. Grey, District Judge.

Argued: April 29, 2026

Decided and Filed: July 22, 2026

Before: STRANCH, BLOOMEKATZ, and HERMANDORFER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benjamin D. Allen, GESS, MATTINGLY & ATCHISON, PSC, Lexington, Kentucky, for Appellant Kevin Fordham. Meghan Sweeney Bean, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Benjamin D. Allen, GESS, MATTINGLY & ATCHISON, PSC, Lexington, Kentucky, for Appellant Kevin Fordham. Linda D. Ashford, Detroit, Michigan, for Appellant Martin Murff. James C. Thomas, Sterling Heights, Michigan, for Appellant Eddie Reid. Meghan Sweeney Bean, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

HERMANDORFER, Circuit Judge. Kevin Fordham, Martin Murff, and Eddie Reid held top posts within the Almighty Vice Lord Nation. Following a lengthy investigation into Vice

Lord operations in Michigan, law-enforcement officers arrested dozens of members in an effort to dismantle the organization's leadership.  Dozens of plea agreements resulted.  But Fordham, Murff, and Reid opted for trial.  After four weeks of proceedings, a jury convicted each of racketeering conspiracy, conspiracy to distribute controlled substances, and related crimes.

All three defendants appealed.  Their consolidated cases present four suppression issues, two Sixth Amendment claims, two sufficiency-of-the-evidence challenges, and a sentencing dispute.  Of those, only Fordham's procedural sentencing challenge has merit.  We therefore vacate Fordham's sentence, remand for Fordham's resentencing, and otherwise affirm.

I

A

Founded in Chicago in the late 1950s, the Almighty Vice Lord Nation (AVLN) is a gang that has grown into a nationwide enterprise with over 30,000 members.  The organization operates under a written constitution and bylaws.  Members must swear oaths of loyalty, abide by the organization's strict code of silence, obey orders without question, and serve as soldiers for the AVLN to the point of death.  They are required to attend weekly meetings and pay regular dues so that the organization can purchase guns, fund drug trafficking, and support incarcerated members.  Those who violate the AVLN's rules face disciplinary proceedings that often end in violent beatings.  Those who cooperate with law enforcement face worse.

The AVLN operates through a complex hierarchy comprising distinct groups and leaders.  This case features two AVLN branches called the Insane Vice Lords and Mafia Insane Vice Lords.  Every branch maintains its own internal leadership structure consisting of Princes and Kings.  But members all ultimately answer to national- and state-level leadership.  At the national level, the Vice Lord King of Kings governs the entire organization.  Below him, national Princes exercise significant authority.  Leaders of branches containing the word "Insane" sit on the El Shabazz Board in Chicago, the Vice Lord "holy land."  Trial Tr. Vol. 15, R.1345, PageID 11939-40; Trial Tr. Vol. 1, R.1310, PageID 9032.  The El Shabazz Board directs and controls all Insane branches nationwide.  Each state in which the AVLN operates in turn has its own Supreme Elite, the highest-ranking member in that jurisdiction.  In Michigan, the Supreme Elite

chairs the Michigan Board, a governing body made up of the highest-ranking Vice Lords from each branch within the state.

Despite the AVLN's complex structure, Vice Lord allegiance transcends branch lines. When any Vice Lord puts out the call for an "aid and assist," all others must respond without hesitation. Trial Tr. Vol. 5, R.1325, PageID 9802-03. Members owe the same obedience to any higher-ranked Vice Lord.

B

In 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives began an investigation with a single goal: dismantle the AVLN's Michigan operations from the top down. For years, ATF agents worked to penetrate the organization. They cultivated confidential informants, monitored thousands of jail calls, conducted controlled purchases of narcotics and firearms, obtained court-ordered wiretaps on the cell phones of key members, and secured search warrants for social-media accounts, personal devices, and member homes. At the center of the investigation were Kevin Fordham, Martin Murff, and Eddie Reid.

Fordham, an Insane Vice Lord, simultaneously held two of the AVLN's most powerful positions. At the state level, he was the Supreme Elite of Michigan and served as chairman of the Michigan Board. In the national hierarchy, he held the rank of Prince and sat on the El Shabazz Board, where he wielded the self-proclaimed "deciding vote." Ex. 3601, 1:42-45. These roles gave Fordham nationwide influence. As Fordham boasted, Vice Lords across the country knew his name and his "status [would] stick anywhere." Ex. 3611B, 0:10-17.

Martin Murff was a Chicago-based national Prince of the Mafia Insane Vice Lords. At the time of the investigation, he was the highest-ranking active member of the branch. In that role, he sat with Fordham on the El Shabazz Board.

Operating below Fordham and Murff was Eddie Reid, the highest-ranking Mafia Insane Vice Lord in Michigan. He represented his branch on the Michigan Board alongside Fordham.

As the law-enforcement investigation progressed, agents uncovered the AVLN's extensive criminal operations in Michigan. Among other things, agents became aware of

narcotics distribution, firearms trafficking, and numerous violent acts committed under the Vice Lord banner. The discussion below addresses only the activities most relevant to this appeal.

*Drug trafficking.* Federal agents discovered a drug-distribution network that ran through the organization's hierarchy and extended from Chicago to Michigan and beyond. From Chicago, Murff orchestrated the supply chain and coordinated distribution to other Vice Lords. At his direction, members transported substantial quantities of controlled substances across state lines. Vice Lords looking for illegal narcotics often reached out to Murff. Reid worked closely with Murff—his branch's Prince—in coordinating sales and supply runs. On one occasion, when a courier transporting two kilograms of fentanyl from Atlanta was intercepted, Reid led efforts to secure replacement shipments. Reid also regularly corresponded with other Vice Lords about drugs and personally participated in multiple controlled purchases.

Fordham's involvement in the drug-distribution network also came to light during the investigation. As Supreme Elite of Michigan, Fordham kept close tabs on the AVLN's drug operations in the state. Agents testified that Fordham discussed drug trafficking daily during the 90-day period his phone was wiretapped. In one recorded call, Reid reported sourcing cocaine from Vice Lords in Chicago and noted that the favorable price he received was likely because the sellers knew Fordham. Fordham agreed and discussed with Reid the importance of securing a consistent supply for trafficking purposes. Other members also updated Fordham of their sale activity by text. And when the AVLN's drug operations came under law-enforcement scrutiny, members informed Fordham.

Investigators also conducted dozens of controlled purchases from Vice Lords using confidential informants and undercover officers. One of the investigation's key players—Confidential Informant 27016—completed four purchases of crack cocaine, cocaine, and marijuana directly from Fordham, each for resale quantities. CI-27016 later provided details about the AVLN's drug activities. He confirmed that the general ethos of the operation was "we all eat"—meaning, "collectively we gonna get money together." Trial Tr. Vol. 5, R.1325, PageID 9869. To accomplish that goal, members purchased their supply from within the AVLN distribution chain, gave each other "family discount[s]," and paid dues that helped fund additional drug purchases. *Id.* at PageID 9800.

*Code of silence.*  Beyond drug distribution, the investigation revealed numerous acts of violence committed to protect and promote the AVLN.  Many of these acts stemmed from violations of the organization's strictly enforced code of silence.  Vice Lords actively monitored court filings for potential cooperators, including by circulating documents and witness lists among themselves via text and social media.  Anyone suspected of assisting law enforcement was promptly reported to leadership.

The consequences for perceived cooperation could be lethal.  During the investigation, agents learned of a kill order issued against an AVLN member suspected of cooperation and intervened to warn him of the threat.  While leadership agreed to postpone his sentence until law-enforcement scrutiny subsided, others were less fortunate.  The Michigan Board once ordered the death of an inmate suspected of cooperating, leading to a prison stabbing that left him in critical condition.  Subsequent testimony established that such violent retaliation was a standard part of Vice Lord procedure.  Members learned how to fashion weapons, identify blind spots in prison security systems, and efficiently kill fellow inmates.

Fordham's own communications reflected the same preoccupation with exposing cooperators and preserving AVLN integrity.  He possessed lists of potential cooperators and coordinated retaliatory efforts.  In one recorded call, Fordham suggested having an individual "watch the sunset"—common code for a targeted killing.  Trial Tr. Vol. 14, R.1344, PageID 11715.  And when another Vice Lord broke the code, it was Fordham who approved the "charges" against her.  *Id.* at PageID 11658.

C

After three years of investigation, the Government obtained a grand-jury indictment charging 40 AVLN members and their associates with racketeering conspiracy, multiple drug conspiracies, and other related offenses.  In the early hours of June 3, 2021, law-enforcement officers arrested dozens of these individuals in one fell swoop.  Fordham, Murff, and Reid were among those apprehended.

While many of their associates entered plea agreements, Fordham, Murff, and Reid proceeded to trial.  Fordham was charged with five counts:  Racketeer Influenced and Corrupt

Organizations conspiracy (Count 1), two counts of conspiracy to distribute controlled substances (Counts 4 and 5), possession with intent to distribute marijuana (Count 40), and possession of a firearm in furtherance of the marijuana offense (Count 41).  Counts 40 and 41 arose from the events of June 3, when arresting agents discovered large quantities of marijuana and other drug paraphernalia in Fordham's home, along with three firearms stored nearby.  Murff and Reid were also charged in the RICO conspiracy (Count 1) and with one count of conspiracy to distribute controlled substances (Count 5).  Reid faced two additional counts of distribution of controlled substances (Counts 25 and 26), and one count of possession with intent to distribute controlled substances (Count 27).

After a month-long trial, the jury convicted Murff and Reid on all counts.  It convicted Fordham on Counts 1, 5, and 40—covering RICO conspiracy, national drug-trafficking activities, and possession with intent to distribute.  But it acquitted him of Counts 4 and 41—covering drug trafficking that allegedly occurred in Detroit as well as firearm possession.  At sentencing, Fordham received 200 months' imprisonment, Murff received 235 months, and Reid received 240 months.  Each timely appealed, and we have jurisdiction.  18 U.S.C. § 3742(a); 28 U.S.C. § 1291.

The defendants raise a panoply of issues.  *First*, all three press a range of suppression arguments.  All defendants challenge the admission of evidence obtained through a Title III wiretap of cell-phone communications.  Fordham and Reid also object to the scope of search warrants for information contained within their Facebook accounts.  Next, Reid challenges the warrant that authorized the seizure and search of his cell phone.  Finally, Reid contends that the district court should have suppressed statements made by Vice Lords in a police van after the June 2021 arrests.  *Second*, Murff argues that certain prison-correspondence policies abridged his constitutional right to counsel.  *Third*, Fordham urges that limitations on his cross-examination of a trial witness violated the Sixth Amendment's Confrontation Clause.  *Fourth*, Fordham contests the sufficiency of the evidence supporting two of his convictions.  *Fifth*, Fordham argues that his sentence is procedurally and substantively unreasonable.  We address each issue in turn.

## II

We begin with the defendants' suppression challenges.  When reviewing a district court's denial of a motion to suppress, we examine factual findings for clear error and legal conclusions de novo.  *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011).  We view all evidence in the light most favorable to the government.  *Id.*  The movant bears the burden of establishing a constitutional or statutory violation requiring suppression.  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Motions to suppress must be filed before trial and argued "with specificity."  *United States v. Buchanon*, 72 F.3d 1217, 1226-27 (6th Cir. 1995); *see* Fed. R. Crim. P. 12(b)(3)(C).  Defendants who fail to file a pretrial motion to suppress forfeit their suppression arguments on appeal.  *United States v. Ramamoorthy*, 949 F.3d 955, 962 (6th Cir. 2020).  Our review of such forfeited arguments "is permissive, not mandatory."  *United States v. Olano*, 507 U.S. 725, 735 (1993); *see* Fed. R. Crim. P. 52(b).  And we routinely decline to reach forfeited, fact-intensive suppression issues implicating an underdeveloped record.  *See Ramamoorthy*, 949 F.3d at 962 (collecting cases).

## A

The defendants' first suppression challenge concerns certain evidence obtained through wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520.  Defendants argue that the wiretap applications violated Title III's necessity requirement, which they say required exclusion of the resulting wiretap evidence.

### 1

Title III provides that a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  That language, we have noted, imposes a "necessity requirement" for wiretap applications.  *United States v. Gardner*, 32 F.4th 504, 514 (6th Cir. 2022).  That requirement in

turn helps ensure that wiretaps are not "used thoughtlessly or in a dragnet fashion." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988).

To make the requisite Title III showing, however, law enforcement need not "prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Id.* Instead, we evaluate whether applications satisfy three criteria: (1) the wiretap cannot be "the initial step" in an investigation, (2) "traditional investigative techniques" must be inadequate under the circumstances, and (3) investigators' reliance on past experience in addressing the necessity of a wiretap must be tied to the "particular facts of the case." *Gardner*, 32 F.4th at 515 (citations omitted). In short, investigators must "give serious consideration to the non-wiretap techniques" before seeking a wiretap and inform the issuing court why "such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64 (citation omitted).

Courts analyze wiretap evidence differently than traditional suppression motions. That is because Title III wiretaps involve two layers of decisionmakers: the district court that originally authorized the wiretap and the district court that later denied the motion to suppress wiretap evidence. *Gardner*, 32 F.4th at 514. An assertion that a wiretap application fails Title III's necessity requirement "attacks the *issuing* district court's determination." *Id.* We accord that determination "great deference" and reverse only if the issuing court abused its discretion by authorizing the wiretaps. *Alfano*, 838 F.2d at 162 (quotation marks omitted); *see Gardner*, 32 F.4th at 514.

2

Before applying those standards, we address the scope of the wiretap evidence that is properly under review. Throughout the investigation, law-enforcement agents obtained several wiretaps on the phones of key AVLN members. In the district court suppression proceedings, however, the defendants challenged only a January 15, 2021, order authorizing a wiretap on Murff's phone. Murff's suppression motion argued that the wiretap application flunked the statutory necessity requirement. Though Fordham and Reid later joined the Murff wiretap motion, neither joinder filing mentioned any other wiretap.

On appeal, Fordham and Reid seek to expand their challenge by contesting multiple wiretaps—beyond that on Murff's phone—obtained during the investigation. Fordham, the only defendant to file a reply,[1] offers two reasons why the broader challenge was preserved. To start, Fordham claims that his joinder expressed intent to "argue in conjunction with" Murff's motion. Reply Br. 7. In addition, Fordham notes that his counsel prefaced his remarks at the suppression hearing by claiming that all the wiretaps were "clones" of one another. *Id.* In his telling, both statements indicate an intent to go beyond the four corners of Murff's suppression motion and challenge every wiretap that captured Fordham's calls.

Neither statement supports Fordham's broader suppression arguments. Murff's written motion expressly limited the suppression challenge to the Murff wiretap alone. Fordham's request to join and argue in conjunction with that motion—through a filing that never mentioned another wiretap—lacks the requisite "specificity" to expand the suppression motion's scope. *See Buchanon*, 72 F.3d at 1226-27. The same goes for the ambiguous remarks by Fordham's counsel at the hearing, which did not present or otherwise expand on challenges to other wiretap evidence. Accordingly, Fordham and Reid have forfeited any challenge to Title III wiretaps other than the wiretap on Murff's phone.

In this suppression context, defendants' forfeiture leaves us with two options: review for plain error or not at all. *Ramamoorthy*, 949 F.3d at 962. "[I]n the ordinary case, where the defendant's suppression claim hinges on unresolved issues of fact, the more prudent course is to decline to exercise plain-error review." *Id.* at 964. We heed that path here. Wiretap suppression claims are fact-intensive, detail-oriented inquiries that depend on the exact content of the challenged application. *E.g.*, *Gardner*, 32 F.4th at 515-18. Yet here, the other wiretap applications Fordham and Reid purport to challenge were never introduced into the record. While Fordham claims that review is still possible because these other applications were "clones" of the Murff application, he has offered no support for that assertion. Reply Br. 7. Nor does that argument solve the lack of record fact-findings about the state of the investigation and

---

[1]We reiterate that reply briefs, though not required, "are critical to inform the court if a defendant disagrees with the government's argument." *United States v. House*, No. 25-5505, 2026 WL 1168127, at *2 n.1 (6th Cir. Apr. 29, 2026).

sufficiency of traditional techniques at the time agents obtained these other wiretaps. We therefore limit our review to the Murff wiretap application.

3

The Murff wiretap application satisfies each of the three necessity criteria we have applied to Title III.

*Initial step.* First, the wiretap was not an initial step in the investigation. *See Gardner*, 32 F.4th at 515. Law-enforcement officers had actively pursued the AVLN network for three years before applying for the wiretap. This Court has held that just one year of traditional investigation was "an appropriate time" to wait in comparable cases. *Id.*; *see also United States v. Turner*, Nos. 22-5046/5107/5131/5681/6056, 2024 WL 3634454, at *2 (6th Cir. Aug. 2, 2024) (about a year in another AVLN investigation). During those three years, moreover, investigators employed an array of traditional techniques, including: cultivating two confidential informants embedded in the AVLN enterprise; reviewing hundreds of phone calls to those informants and thousands of prison calls by AVLN members; conducting multiple controlled purchases of narcotics through confidential informants and undercover officers; surveilling various AVLN members; installing multiple pole cameras; obtaining around 200 federal grand jury subpoenas regarding internet transactions, money transfers, and prison calls; executing multiple search warrants on the homes and social-media accounts of AVLN members; using pen registers on the phones of AVLN leadership; and reviewing public records and police reports. These efforts confirm that law enforcement did not seek to shortcut their investigation by obtaining the wiretap as an initial step. *See Gardner*, 32 F.4th at 515; *United States v. Gonzalez*, 849 F. App'x 557, 562-63 (6th Cir. 2021); *United States v. Patel*, 579 F. App'x 449, 454 (6th Cir. 2014).

*Use of traditional techniques.* Second, the application explained why each of the above traditional methods of investigation had failed, run its course, would be "too dangerous" to pursue, or appeared "unlikely to succeed." 18 U.S.C. § 2518(1)(c); *see Gardner*, 32 F.4th at 515. Some techniques—like visual surveillance, pole cameras, and pen registers—could provide information on Vice Lords' general patterns of movement and communication but failed to shed light on the innerworkings of AVLN leadership. Techniques that involved soliciting information

from members were frustrated by the AVLN's code of silence and policy of violent retaliation, both of which were documented in the application. The group's compartmentalization and hierarchical structure further frustrated investigative efforts; for instance, information on the Michigan and El Shabazz Boards was shielded from most rank-and-file members. For that reason, undercover officers and current confidential informants lacked insight into either Board.

The defendants insist that investigators should have conducted more surveillance, cultivated additional confidential sources, or attempted trash pulls and GPS tracking. But Title III is not an exhaustion requirement that forces investigators to attempt the "full panoply of surveillance techniques." *United States v. Wright*, 635 F. App'x 162, 167 (6th Cir. 2015). It is enough that investigators considered alternative methods and explained why they would be inadequate to accomplish the goals of the investigation. *See Alfano*, 838 F.2d at 163-64. Here, the application detailed how earlier surveillance efforts were unsuccessful and at times thwarted by AVLN countersurveillance techniques. It further explained that cultivating additional sources may be ineffective or dangerous. New sources would require significant time to rise through the ranks and reach a position where they were privy to Board matters. Meanwhile, recruiting existing AVLN members risked unearthing the entire investigation with one ill-chosen target. Finally, the application noted that trash pulls and GPS tracking were both unlikely to yield information on internal Board affairs. That explanation sufficed under Title III to show the shortcomings of traditional investigatory methods.

*Case-specific support.* Third, as the above details confirm, investigators keyed their alternative-methods assessment to the "particular facts of the case at hand." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). Defendants' chief counter—that the application impermissibly relies on generic or "boilerplate" assertions—does not hold up. Reid Br. 21; Murff Br. 45; *see also* Fordham Br. 18-19. To be sure, the application at time drifts into the generic. But caselaw recognizes that certain patterns hold constant across criminal organizations. *See Gardner*, 32 F.4th at 517. So wiretap applications can rely on generalizations so long as "specific examples provide support along the way." *Id.* Investigators cleared that bar by pairing general statements about the nature of gangs or the futility of certain techniques with AVLN literature and specific incidents throughout the investigation. The defendants'

mere-"boilerplate" objection "fail[s] to contend with" the presence of "case-specific examples." *Id.*

To sum up, the Murff wiretap application established that officers gave "serious consideration" to traditional techniques before reasonably concluding that those methods could not bring down the Michigan and El Shabazz Boards. *Alfano*, 838 F.2d at 163 (citation omitted). The challenged wiretap approval was lawful, as was the admission of the resulting evidence.

B

Next, Fordham and Reid argue that evidence recovered from their Facebook accounts should have been suppressed because the search warrants were unconstitutionally overbroad.

*The warrants*.  As the investigation unfolded, it became clear that Vice Lords routinely used Facebook for a wide range of activities including coordinating meetings, discussing internal governance, and selling drugs and firearms.  Fordham and Reid were no exception.  The publicly available portions of their accounts showed both men self-identifying as Vice Lords and discussing AVLN business.  So, in December 2019, investigators sought a warrant for information related to three Facebook accounts, including Fordham's.  About two months later, they sought a warrant for six other accounts, including Reid's.

Both warrants followed a two-step structure.  *See* Fed. R. Crim. P. 41(e)(2)(B).  At step one, Facebook was ordered to disclose broad categories of account data.  Many categories lacked any time limits on the data requested.  But, as relevant here, the warrants limited the production of photos and messages to January 2014 onward for Fordham and January 2015 onward for Reid.  At step two, the warrant authorized officers to seize only that information constituting fruits, evidence, or instrumentalities of the crimes under investigation.  In addition, that step-two authorization was likewise time-bound to January 2014 onward for Fordham and January 2015 onward for Reid.

Before trial, Fordham and Reid moved to suppress all evidence obtained under the two-step Facebook warrants.  As their sole basis for suppression, Fordham and Reid argued that the

breadth of step one's disclosures rendered the warrants unconstitutionally overbroad.  The district court denied the motion.

*Overbreadth*.  The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Particularity challenges come in two varieties: clarity and overbreadth.  *See Richards*, 659 F.3d at 537.  Fordham and Reid raise the latter, arguing that each warrant's scope "is too broad in the sense that it includes items that should not be seized."  *Id.* (citation omitted).  In other words, they argue that particular portions of the warrant permitted seizures that were not supported by probable cause.  *See id.*  We review such claims de novo.  *Id.* at 536.

Seizing items beyond the proper scope of a warrant violates the Fourth Amendment and "generally requires that either an officer request a new warrant to seize items not in the warrant's scope or that an exception to the warrant requirement must apply."  *United States v. Whiteside*, 141 F.4th 734, 747 (6th Cir. 2025).  Overbreadth, however, does not "doom the entire warrant."  *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001).  Instead, courts isolate the overbroad portions and suppress only the "evidence seized pursuant to that part of the warrant."  *Id.* (citation omitted).  That principle applies on appeal, too.  Where the evidence "seized pursuant to the overbroad portion of the search warrant was not introduced into evidence . . . [the defendant] was not prejudiced by the defect in the warrant."  *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991).

Sometimes, as here, defendants pressing overbreadth challenges assert that a warrant provision should have been narrowed with *additional* constraints.  In such cases, courts decline suppression if the challenged evidence would have been seized even under the narrower warrant.  *See United States v. Hanna*, 661 F.3d 271, 287 (6th Cir. 2011); *United States v. Honeysucker*, No. 21-2614, 2023 WL 142265, at *5 (6th Cir. Jan. 10, 2023).  For instance, even when this Court has agreed that warrants should have covered only a particular time period, we've explained that suppression follows only for evidence that falls outside that time window.  *See United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006); *United States v. Neuhard*, 770 F. App'x 251, 254 (6th Cir. 2019).  We've indicated the same for subject-matter limitations.  *See Hanna*, 661 F.3d at 287.

Both lines of cases illustrate the same basic point.  A defendant cannot seek suppression on the ground that a warrant lacks safeguards if the challenged evidence still would have been seized with the safeguards in place.  In such cases, the defendant has suffered no prejudice from the warrant's alleged overbreadth.  *See id.*; *Abboud*, 438 F.3d at 576.  And no prejudice as to the trial evidence means no suppression.

Our most recent encounter with a two-step warrant in *United States v. Honeysucker* confirms this rule.  *See* 2023 WL 142265, at *5.  At step one, the *Honeysucker* warrant sought broad cell-phone-record disclosures from T-Mobile—many without time limits.  *Id.* at *4.  Yet step two then limited the items subject to seizure to the fruits of the suspected crimes and imposed a particular date range.  *Id.*  In seeking suppression, Honeysucker asserted that the Fourth Amendment required temporal restrictions at step one.  *Id.*  We noted that even if Honeysucker were correct, he offered "no argument that any trial evidence or evidence that contributed to his conviction" came from beyond the time period he requested.  *Id.* at *5.  That meant the evidence Honeysucker sought "to suppress would have been recovered even if the warrant had imposed that limitation."  *Id.* at *10 (Moore, J., concurring in part and concurring in the judgment).  So there was simply "no evidence to be severed for overbreadth."  *Id.* at *5.

Fordham and Reid's overbreadth challenge encounters the same problem.  Both generally allege three deficiencies with the warrants.  They claim that step one of the warrant (1) was not tailored to the crimes alleged, (2) exceeded the time period covered by the indictment, and (3) extended beyond AVLN-related matters.  But all three proposed restrictions—as to crimes, the time period, and non-AVLN matters—were in place at step two.  Perhaps for that reason, Fordham and Reid have not cited any evidence introduced at trial that falls outside the temporal and subject-matter guardrails they now seek.[2]  Nor do they argue that the allegedly improper

---

[2]During oral argument, Fordham's counsel newly asserted that the four-year period governing seizure of the Facebook photographs and messages was too lengthy.  Counsel pressed that contention even while acknowledging that the charged conspiracy spanned longer than four years.  *But see United States v. Zelaya-Veliz*, 94 F.4th 321, 338 (4th Cir. 2024) (explaining that the conspiracy's "wide-ranging nature" and breadth helped "mitigate[] any concern that the scope of the warrant was impermissibly broad").  In any event, because the four-year challenge made its first appearance at oral argument, it is forfeited.  *Resurrection Sch. v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc).

scope at step one yielded any evidence or investigatory leads distinct from the evidence seized at step two.

Thus, even had Fordham and Reid's preferred limitations been present at step one, the record indicates that the challenged trial evidence "would have been lawfully acquired." *Hanna*, 661 F.3d at 287. We therefore need not address whether the Facebook warrants' two-step structure violated the Fourth Amendment. Fordham and Reid's failure to link their overbreadth claim with the exclusion of any evidence independently forecloses their challenge. *Id.*; *Blakeney*, 942 F.2d at 1027.

C

Reid next challenges the admission of evidence seized from his cell phone.

When officers arrested Reid, they executed a search warrant at his residence that authorized the seizure of various items, including his cell phone. The warrant also permitted officers to search electronic-storage media seized for evidence of the crimes charged in the indictment. Reid contends the warrant was overbroad because it lacked temporal limits, though he does not dispute that the core of the warrant was supported by probable cause.

The warrant passes muster under our Court's caselaw. We have repeatedly upheld warrants authorizing the seizure of computers for subsequent off-site forensic search when "the warrant application and affidavit demonstrate a sufficient chance of finding some needles in the computer haystack." *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) (citation omitted) (collecting cases). That's because the unique nature of electronic-storage mediums makes it difficult to know ex ante where or in what format relevant evidence may be stored. *Id.* at 653. We apply the same principles to cell phones, which "may contain a litany of information" functionally "equivalent to a personal computer." *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015). Thus, we've upheld cell phone search warrants without temporal limits against overbreadth challenges when the warrant is limited to evidence of the crimes under investigation. *See id.* at 1049-50. Because the warrant for Reid's phone was so limited, it was not overbroad.

Reid's counterarguments do not change that conclusion.  He suggests that officers needed a second warrant before conducting a forensic extraction from the phone.  But a second warrant to search properly seized electronic devices is unnecessary if "the evidence obtained in the search did not exceed the probable cause articulated in the original warrant."  *Evers*, 669 F.3d at 652 (quoting *Richards*, 659 F.3d at 539 n.10).  He also briefly faults the *affidavit* for not limiting itself to specific crimes, but in so doing ignores that such a limit was contained in the *warrant*.

For those reasons, we affirm the district court's denial of the motion to suppress the evidence seized from Reid's phone.

D

Reid's final suppression challenge addresses statements that he and other Vice Lords made while detained in law-enforcement vehicles following their arrests.

After the coordinated arrests on June 3, 2021, many arrestees were held in two vans while awaiting interviews at an ATF field office.  Both vans were equipped with recording devices, and some of the conversations captured on recordings were introduced at trial.  No defendant filed a pretrial motion to suppress these statements.

Reid now argues that the surreptitious recording violated his Fourth Amendment rights.  Because he failed to file a motion to suppress, he forfeited that claim.  *See Ramamoorthy*, 949 F.3d at 962; Fed. R. Crim. P. 12(b)(3)(C).  Moreover, whether an individual has a reasonable expectation of privacy is "necessarily a fact-dependent inquiry" that must be undertaken "on a case-by-case basis."  *Hicks v. Scott*, 958 F.3d 421, 431 (6th Cir. 2020) (citation omitted).  Reid did not develop a record that might aid us in conducting that inquiry.  So, as with the forfeited Title III-wiretap challenges, we decline to review this fact-intensive suppression claim.  *See Ramamoorthy*, 949 F.3d at 962.

Reid also briefly asserts that the recording violated the Wiretap Act, that the statements were inadmissible under Federal Rule of Evidence 801(d)(2)(E), and that their admission violated his Confrontation Clause rights.  Those assertions are "unaccompanied by some effort at

developed argumentation," and thus forfeited. *United States v. Taylor*, 165 F.4th 1029, 1036 (6th Cir. 2026) (citation omitted).

III

Turning to the Sixth Amendment challenges, we begin with Murff's claim that a prison-mail policy violated his constitutional right to counsel.

Murff's challenge arises from the policy at his pretrial-detention facility, the Sanilac County Jail. During Murff's time there, suboxone was smuggled into the facility through "bogus legal mail." Murff Mail Hr'g, R.966, PageID 6112. That incident prompted officials to update the jail's incoming mail policy. Under the new protocol, officers opened legal mail in the detainee's presence, copied it, provided the copies to the detainee, and placed the originals with his personal property. Later, the jail added a final step of resealing the originals with signed and dated evidence tape. The policy prohibits officers from reading legal mail.

Before trial, Murff sought a hearing on the mail policy, arguing that it violated his attorney-client privilege and Sixth Amendment right to counsel. He objected both to the copying of legal mail—fearing the copier could be hacked—and to the jail's retention of the original mail—fearing officers might read it. The district court held that the mail policy did not violate Murff's Sixth Amendment rights. In so holding, it emphasized that Murff had not alleged that the copier was actually compromised or that officers were reading his mail by virtue of the policy.

On appeal, Murff contends that the Sanilac County Jail's mail policy was unconstitutional. Murff further asserts that, to avoid being subject to the policy, he stopped exchanging written correspondence with counsel. From there, he claims that this self-imposed limitation on his written correspondence with counsel so impaired his defense that it violated his Sixth Amendment right to counsel and requires reversal of his convictions. We review that constitutional claim de novo. *See United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005).

To establish a Sixth Amendment violation based on governmental interference with the attorney-client relationship, a defendant must show both an intrusion on the attorney-client

relationship and resulting prejudice.  *See United States v. Steele*, 727 F.2d 580, 585-86 (6th Cir. 1984).  A constitutionally cognizable intrusion requires some "invasion[] of the defense camp," such as the prosecution's gaining improper access to attorney-client communications or learning confidential trial strategy.  *Id.* at 585 (quotation marks omitted); *see United States v. Dobson*, 626 F. App'x 117, 124 (6th Cir. 2015).  If no intrusion occurs, there is no Sixth Amendment violation.  *See Dobson*, 626 F. App'x at 124-25.  But even when there is an intrusion, the defendant must show prejudice to counsel's ability "to provide adequate representation in the[] criminal proceedings."  *United States v. Morrison*, 449 U.S. 361, 366 (1981); *see also Steele*, 727 F.2d at 586.

Murff's challenge to the mail policy fails because the policy does not constitute an intrusion.  The only harm he alleges arises from steps he took to avoid *potential* intrusions that could occur under the mail policy; he never claims that any such intrusion into his attorney-client relationship actually occurred.[3]  The policy itself prohibits officers from reading legal mail.  And, as the district court noted, there is no "ongoing allegation that prison mail is being read by prison officials."  Murff Mail Hr'g, R.966, PageID 6135.  So Murff has not shown any policy-caused intrusion, and we need not reach the issue of prejudice.

One loose end remains.  Murff also believes that the county jail was subject to federal Bureau of Prisons regulations and that its mail policy violated 28 C.F.R. § 540.18.  Even assuming Murff is correct that the regulation applies and contradicts the jail's policy, a regulatory infraction does not provide a standalone basis for reversing his conviction.  *Cf. United States v. Caceres*, 440 U.S. 741, 754-55 (1979).  Because Murff has shown no constitutional violation, he is not entitled to relief.

---

[3]In the hearing on his mail-policy claim, Murff testified about one incident where an officer purportedly admitted to reading his legal mail.  Even if that would qualify as an intrusion, Murff did not allege that such violations were ongoing and does not complain of or attribute prejudice to that single incident on appeal.  His challenge is instead centered on the mail policy itself.

IV

Next, Fordham argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment by limiting his cross-examination of Confidential Informant 27016.

CI-27016 was a Vice Lord who began cooperating with the ATF in 2018. He operated close to Fordham, helping agents track drug operations in Michigan. In that role, CI-27016 completed multiple controlled purchases, including four directly from Fordham. At trial, he testified about those purchases and his broader experience with the AVLN.

As relevant here, the Government moved in limine to limit cross-examination of CI-27016 about his criminal record, dismissed charges, and an outstanding warrant. Fordham opposed the motion, urging that such information was critical to impeaching CI-27016's propensity for truthfulness and flagging his potential incentives to testify for the Government. The district court granted the Government's motion in part and denied it in part. It disagreed with Fordham's request to cross-examine CI-27016 about his pre-2013 criminal convictions. But it held that Fordham could elicit CI-27016's four post-2013 felony convictions. As for CI-27016's uncharged acts, the district court concluded that CI-27016's cooperation could lead to a more favorable resolution of the 2021 charge pending in the outstanding warrant. So it permitted Fordham to cross-examine CI-27016 on that basis.

Fordham now argues that prohibiting cross-examination of CI-27016's pre-2013 convictions violated his Confrontation Clause rights. We review his claim de novo. *United States v. Taylor*, 127 F.4th 1008, 1013 (6th Cir. 2025).

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Although cross-examination is central to that right, it is not unlimited. The Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). District courts therefore retain "wide latitude" to impose "reasonable limits" on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

We use a three-step framework to evaluate Confrontation Clause challenges to restrictions on cross-examination. *See Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000). First, we ask whether the district court limited the defendant's ability to elicit information about the "witness's bias, prejudice or motive to testify." *Id.* If so, we next determine "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive." *Id.* If the jury lacked adequate information, we proceed to the third step and balance "the violation against the competing interests at stake." *Id.*

Fordham's claim fails because the jury had sufficient evidence "to assess [Fordham's] theory of bias" and arguments about CI-27016's truthfulness. *Id.* The testimony about CI-27016's criminal history was extensive. He admitted that he had been a Vice Lord for approximately 14 years, during which he became an AVLN enforcer and independently committed assaults and other crimes. The jury learned that CI-27016 amassed four felony convictions in the past ten years, failed to pay taxes on the money he received from ATF, and had two outstanding warrants—one for breaking and entering a vehicle and another for making terroristic threats against a family member. On top of that, CI-27016 volunteered that he had been incarcerated from around 1999 to 2009.

Questioning of CI-27016 also probed his personal incentives to cooperate. On cross-examination, he freely admitted that he didn't want to go back to prison. Even when explaining that he was "tired" of criminal activity and had decided to turn over a new leaf, he acknowledged that his cooperation with ATF was motivated by "self-preservation." Fordham also introduced statements ATF agents made during an interview with CI-27016 that could be interpreted as threats to pursue charges absent cooperation.

In short, the jury had plentiful evidence from which to evaluate Fordham's arguments about CI-27016's truthfulness and incentives to cooperate. Any additional evidence on these fronts therefore "would have been cumulative." *United States v. Martin*, 526 F. App'x 643, 648 (6th Cir. 2013). The district court's limitations on cross-examination did not violate Fordham's Confrontation Clause rights.

V

Fordham next challenges the sufficiency of the evidence supporting his convictions for conspiracy to distribute controlled substances and RICO conspiracy.

A defendant bringing a sufficiency challenge "bears a very heavy burden." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (citation omitted). While our review is de novo, we are "highly deferential to the jury's verdict." *United States v. Baskerville*, 164 F.4th 459, 472 (6th Cir. 2026) (citation omitted). The test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When answering that question, we "may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

A

To convict Fordham of conspiracy to distribute controlled substances, the Government had to prove three elements: "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007); *see* 21 U.S.C. §§ 841(a)(1), 846.

*The conspiracy*. Agreements to violate drug laws "need not be express or formal." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006). A mere "tacit or mutual understanding among the parties is sufficient." *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994). That understanding "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (citation omitted). When a criminal organization and a drug conspiracy are intertwined, courts often consider whether the group "intended to use its organizational structure and contacts to facilitate the sale of drugs." *Id.* at 680. Relevant factors may include common supply chains, intra-organization sales, and whether drug proceeds flow back into the organization's coffers. *See id.* at 680-81; *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008).

Here, Fordham, Murff, Reid, and five other Vice Lords were charged with conspiracy to distribute fentanyl, heroin, cocaine, and marijuana.  The Government offered sufficient evidence for a rational jury to find an agreement to that effect.

The jury heard testimony from CI-27016 that being a Vice Lord was "like having tentacles"—it plugged members into a broader drug-distribution network.  Trial Tr. Vol. 5, R.1325, PageID 9815.  Members were encouraged to purchase from suppliers within the AVLN chain, who gave fellow Vice Lords the "family discount," in a coordinated effort to maximize profits.  *Id.* at PageID 9800.  Member dues also went towards purchasing more drugs for the organization.  That testimony was corroborated by calls and texts between the charged co-conspirators.  The evidence at trial captured those individuals discussing shared suppliers, fronting drugs, coordinating large-scale shipments across state lines, and completing multiple controlled sales.  It was more than sufficient for a rational juror to conclude there was "an agreement to violate drug laws."  *Gardner*, 488 F.3d at 710.

*Fordham's knowledge and participation*.  "Once a conspiracy is shown, evidence connecting a particular defendant to the conspiracy need only be slight."  *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999) (citation omitted).  Proving a defendant's participation "does not require an action furthering the conspiracy."  *United States v. Bailey*, 170 F.4th 573, 583 (6th Cir. 2026) (citation omitted).  Rather, it "may be inferred from [his] actions and reactions to the circumstances."  *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir. 1994) (citation omitted).  To be convicted, a defendant does not have to be involved in "every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement."  *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991) (citation omitted).

The Government presented sufficient evidence tying Fordham to the drug conspiracy.  Fordham's leadership position in the AVLN network gave him significant influence over the organization's affairs.  Fordham's reach extended to the AVLN's drug-related activities.  Agents testified that Fordham spoke of drug trafficking on a daily basis.  Trial evidence captured Fordham and Reid discussing how Chicago-based distributors respected Fordham's status.  Other communications showed AVLN members keeping Fordham apprised of drug prices or quality.  And Fordham himself sold distribution quantities of various narcotics to CI-27016 on four

occasions. During one of these sales, Fordham offered to connect CI-27016 to his supplier and elected not to upcharge CI-27016 because he was Fordham's "little bro"—a common manner of referring to fellow AVLN members. Ex. 2945A, 3:38-40. Together, the trial evidence readily surpasses the "slight" threshold required to link Fordham to the charged narcotics conspiracy. *Gibbs*, 182 F.3d at 421 (citation omitted).

Fordham's counterarguments do not convince. He asserts that the Government's case rests entirely on his four transactions with CI-27016. Yet that overlooks the "additional evidence" outlined above demonstrating that Fordham's involvement went beyond a "mere purchase or sale." *Deitz*, 577 F.3d at 680 (citation omitted). Fordham next contends that his conviction must be overturned because (1) the Government didn't prove that the drugs he sold were fronted by AVLN members and (2) there was no evidence that he shared profits from his personal sales. But neither is required to sustain his conviction. *Bailey*, 170 F.4th at 583; *United States v. Mosley*, 53 F.4th 947, 959 (6th Cir. 2022). The evidence enabled a rational juror to conclude that Fordham knew that his co-conspirators intended to use the AVLN's "organizational structure" to violate the drug laws, and that he "acquiesced in that agreement." *Deitz*, 577 F.3d at 680 (citation omitted). That is sufficient.

We therefore affirm Fordham's conviction for conspiracy to distribute controlled substances.

B

We next turn to Fordham's conviction for racketeering conspiracy, which required the Government to prove: "(1) that an enterprise existed; (2) that the enterprise was engaged in, or that its activities affected, interstate commerce; (3) that the defendant was employed by or associated with the enterprise; and (4) that the defendant conspired to 'conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *Baskerville*, 164 F.4th at 476 (quoting 18 U.S.C. § 1962(c)).

Fordham's opening brief meaningfully contested only the AVLN's status as a RICO enterprise. But in his reply brief, Fordham concedes that the enterprise element is off the table because his Rule 29 motion failed to raise it as a basis for acquittal. *See United States v. Porter*,

886 F.3d 562, 566 (6th Cir. 2018) (order).  So he instead suggests in passing that the evidence was insufficient to establish the conspiracy element—an argument he did raise below.  But he forfeited the argument on appeal by failing to raise it in his opening brief.  *See Kuhn v. Washtenaw County*, 709 F.3d 612, 624-25 (6th Cir. 2013).  Fordham's reply brief, moreover, simply asserts insufficiency without citing governing caselaw or the evidence at trial.  So Fordham's "skeletal" reply discussion of the conspiracy element is forfeited twice over.  *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016).

Regardless, the Government presented sufficient evidence.  To prove the conspiracy portion of the RICO-conspiracy charge, the Government had to tie Fordham to a "pattern of racketeering activity."  18 U.S.C. § 1962; *see Baskerville*, 164 F.4th at 477.  That pattern requires at least two predicate acts, as defined by statute.  18 U.S.C. § 1961(5).  And evidence must show that Fordham "adopt[ed] the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  Unlike with a substantive RICO offense, for a RICO conspiracy charge the Government need not prove that Fordham "agreed to commit two predicate acts himself, or even that any overt acts have been committed." *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005).  It is enough if Fordham agreed, whether formally or informally, to "facilitate" an underlying "scheme" that would involve some AVLN member committing two predicate acts.  *Salinas*, 522 U.S. at 65; *see Baskerville*, 164 F.4th at 477.  Suffice it to say, the evidence along those lines—ranging from Fordham's status as the top Vice Lord in the state of Michigan, to his intelligence briefings about the AVLN's drug trafficking, to his commitment to and extensive involvement with advancing the AVLN's status, to a bevy of predicate acts by Fordham and other AVLN members comprising drug and violent offenses—abounded.  So even putting forfeiture aside, Fordham's RICO conspiracy conviction stands.

VI

The final issue in this appeal is Fordham's challenge to his sentence.  Because we vacate Fordham's sentence on procedural grounds, we do not reach his substantive arguments.  *See United States v. Adams*, 873 F.3d 512, 520 (6th Cir. 2017).

Fordham's procedural objection focuses on the district court's application of a two-level enhancement under U.S.S.G. § 2D1.1(b)(1). That provision, among other things, directs district courts to enhance a defendant's offense level if the convicted offense had certain characteristics. As it related to enhancing Fordham's sentence for the drug-trafficking conviction, the cited conduct was that "a dangerous weapon (including a firearm) was possessed." *Id.*

Recall that, during Fordham's arrest, agents found three firearms in Fordham's home near large amounts of marijuana and drug paraphernalia. That discovery gave rise to Count 40 (possession with intent to distribute marijuana) and Count 41 (possession of a firearm in furtherance of Count 40). The jury convicted Fordham on Count 40's drug charge. But they acquitted him on the accompanying firearm-possession charge in Count 41.

When it came time for sentencing, though, the same three firearms giving rise to acquitted Count 41 appeared in Fordham's presentencing report. Citing the discovery of those firearms, the report recommended a two-level enhancement under § 2D1.1(b)(1) for possessing a dangerous weapon. Fordham filed an objection to the proposed enhancement that was later repeated in an addendum to the presentence report. Fordham's written objection asserted that (1) he was acquitted on Count 41's firearms-possession charge and (2) insufficient evidence supported the enhancement's application.

Then, just weeks before Fordham's sentencing, the U.S. Sentencing Commission's acquitted-conduct amendment took effect. U.S.S.G. § 1B1.3(c) (2024). Under it, "[r]elevant conduct" for purposes of applying the § 2D1.1(b)(1) enhancement "does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." *Id.* § 1B1.3(c). The district court ordered supplemental briefing on whether the amendment affected Fordham's sentencing range. But the briefing primarily addressed drug quantities underlying other counts— not the firearms enhancement—and the district court's subsequent order only discussed drug quantities. *See United States v. Fordham*, 797 F. Supp. 3d 746 (E.D. Mich. 2024).

Sentencing then proceeded. At the sentencing hearing, the district court stated that it was following the presentencing report's recommendation to apply the dangerous-weapon

enhancement. In so doing, the district court did not squarely address Fordham's written acquitted-conduct objection.

To impose a procedurally reasonable sentence, district courts must "adequately explain the chosen sentence to allow for meaningful appellate review." *Gall v. United States*, 552 U.S. 38, 50 (2007). When a defendant presents a non-frivolous argument for a lower sentence, "the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006); *see United States v. Thomas-Mathews*, 81 F.4th 530, 544 (6th Cir. 2023) (collecting cases). That is not to say that every objection requires an explanation. We recognize that "arguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence." *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006) (citation omitted). But "remand may be appropriate" when a defendant presents "an arguably meritorious claim for a lesser sentence, but there is little to suggest that the district court actually considered it." *Id.*

The Government does not argue that Fordham forfeited his acquitted-conduct objection by raising it only in written objections to the presentencing report rather than in the acquitted-conduct briefing or at the sentencing hearing. And it does not dispute that the district court failed to pass on the merits of Fordham's objection during sentencing. Instead, the Government urges us to reject Fordham's acquitted-conduct argument in the first instance. Alternatively, the Government seeks affirmance of Fordham's sentence based upon grounds for the firearms enhancement that were neither pressed nor passed on at sentencing. Those include assertions that Fordham possessed the recovered firearms in furtherance of violent RICO activities and that his co-conspirators possessed other firearms in connection with drug-trafficking offenses.

We decline the Government's request and opt to remand so that the district court may consider the issues now presented. Many of the issues the parties now dispute on appeal—including application of the recent acquitted-conduct amendment or the potential alternative bases for applying the § 2D1.1(b)(1) enhancement—turn on the extensive trial evidence or require resolving the interplay between the complex series of charges in the Government's lengthy indictment. Those are matters on which we lack a developed record and over which the district court maintains superior expertise given its familiarity with these proceedings. For those

reasons, the Guidelines recognize the propriety of permitting district courts, in their sentencing discretion, to pass on such issues in the first instance. *See* U.S.S.G. § 1B1.3 cmt. n.10; *see, e.g.*, *United States v. Clay*, 162 F.4th 757, 779 (6th Cir. 2025).

The district court's management of this complex prosecution is commendable. Our decision to vacate and remand for further consideration of the parties' sentencing arguments reflects that the district court is "better position[ed]" to resolve the outstanding disputes and weigh how they might affect its sentencing calculus. *Clay*, 162 F.4th at 779. We therefore vacate Fordham's sentence and remand for resentencing.

\* \* \*

For the reasons given, we affirm the convictions of Fordham, Murff, and Reid. We vacate Fordham's sentence and remand for Fordham's resentencing.